UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION


ROBERT L. FOSTER,

      Plaintiff,                              Civil Action No. 09-11922

v.                                     HON. THOMAS LUDINGTON
                                        U.S. District Judge
                                        HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL          U.S. Magistrate Judge
SECURITY,

      Defendant.
_____/

## <u>REPORT AND RECOMMENDATION</u>

      Plaintiff Robert L. Foster brings this action under 42 U.S.C. §405(g), challenging a

final decision of Defendant Commissioner denying his application for Disability Insurance

Benefits ("DIB") and Supplemental Security Income ("SSI") under the Social Security Act.

Both parties have filed summary judgment motions which have been referred for a Report

and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  For the reasons set forth below,

I recommend that Plaintiff motion be DENIED and that Defendant's motion be GRANTED.


## <u>PROCEDURAL HISTORY</u>

This case has an extensive procedural history and is broken down as follows.

### 1. Application, Original Administrative Hearing, Appeal, Judicial Review, and Remand

On October 21, 1998, Plaintiff filed a claim for benefits, alleging disability as of September 26, 1996 (Tr. 69-71). After the initial denial of his claim, he requested an administrative hearing, held on December 7, 1999 (Tr. 24). On November 17, 2000, Administrative Law Judge ("ALJ") Ralph J. Muehlig found that although Plaintiff was unable to return to his former work, he could perform a full range of sedentary work (Tr. 23). The Appeals Council upheld ALJ Muehlig's decision on October 17, 2001 (Tr. 8-9). Plaintiff filed suit on April 8, 2003. The district court remanded the case to the administrative level for further proceedings (Tr. 514, ¶11).

### 2. Second Administrative Hearing, Appeal, Judicial Review, and Remand

In accordance with the district court's order, the Appeals Council remanded the case for rehearing on June 4, 2003 for an analysis of Plaintiff's mental impairments (Tr. 338-341). On October 2, 2003, ALJ Richard De Steno conducted a second hearing and on October 29, 2003, found that Plaintiff was not disabled (Tr. 337, 451-475). The Appeals Council denied review on December 15, 2004 (Tr. 311-314). On January 24, 2005, Plaintiff filed a second complaint in district court (Tr. 513-516). On December 20, 2005, Defendant Commissioner stipulated to a second remand to the administrative level (Tr. 517-518). In accordance with parties' stipulation, on April 6, 2006, the Appeals Council remanded the case for additional proceedings, directing the ALJ to (1) evaluate the findings of Plaintiff's treating physician;

(2) explain his/her reasons for rejecting allegations of limitation pursuant to SSR 96-7p; (3) perform a "function-by-function" assessment of Plaintiff's residual functional abilities (Tr. 507A).

### 3. Third Administrative Hearing, Appeal, and Present Claim

Following a brief December 19, 2006 hearing at which Plaintiff did not testify (Tr. 792-799), ALJ Donna Krappa presided at a June 26, 2007 hearing (Tr. 837). Plaintiff, represented by Pamela Levine, testified, as did Medical Expert ("ME") Dr. Richard Goodman (Tr. 846-857, 857-870, 870-871). The hearing was continued to August 14, 2007 (Tr. 802). Plaintiff testified, as did Vocational Expert ("VE") Dr. Steven Feinstein) (Tr. 803-805, 806-832, 832-834). On December 20, 2007, ALJ Krappa found that Plaintiff was not disabled (Tr. 504-505). On April 9, 2009, the Appeals Council denied review (Tr. 476-479). Plaintiff filed for judicial review in this Court on May 20, 2009.

### BACKGROUND FACTS

Plaintiff, born August 1, 1965 was 42 when ALJ Krappa issued her decision (Tr. 69). He completed high school and previously held jobs performing maintenance, security, and food service related positions (Tr. 75, 80). His application for benefits claims disability as a result of back pain (Tr. 74).

### A. Plaintiff's Testimony

On June 26, 2007, Plaintiff testified that since injuring his back, he was less outgoing and athletic, reporting that he had not worked since September 26, 1996 (Tr. 847-848). He

indicated that as a result of his physical limitations, he currently received a $1,135 payment from the Veterans Administration ("VA") each month for "70 percent" disability (Tr. 848). He reported that the only doctors that he saw regularly were a "family doctor" and a dentist (Tr. 849). Plaintiff testified that he took Diovan for blood pressure and Neurantin and Tramadol for pain (Tr. 849). Plaintiff, 5'6," reported a current weight between 260 and 270 pounds (Tr. 850). Noting that he had not been treated for mental health issues since 1999, Plaintiff alleged that the VA was not responsive to his attempts to obtain psychological treatment (Tr. 850). He opined that the VA had been generally careless in diagnosing and treating his ailments (Tr. 851).

Plaintiff reported that he currently lived with his mother in Newark, New Jersey (Tr. 851). He testified that he had not driven since the expiration of his driver's license, noting that he relied on public transportation (Tr. 853). In response to questioning by his attorney, Plaintiff stated that he weighed no more than 200 pounds before becoming disabled (Tr. 855). In response to additional questioning by the ALJ, Plaintiff reported that he was preparing a two-week trip to Michigan to visit a friend, stating that he "need[ed] some time away" (Tr. 870-871).

During the resumed examination on August 14, 2007, Plaintiff, currently weighing between 260 and 280 pounds, testified that before becoming disabled, he weighed between 185 and 215 (Tr. 803). He added that at one point since becoming disabled, he weighed 315 pounds (Tr. 803). Plaintiff reported that he had not visited his family doctor in at least three months (Tr. 804). However, he alleged ankle problems, noting that he was scheduled for an

MRI the following month (Tr. 804). Plaintiff, acknowledging that he had been advised to lose weight, testified that he was unable to do so because he was "in pain all the time" (Tr. 805). When asked by the ALJ "what's the biggest problem that prevents you from working today as you sit here in my hearing room?" Plaintiff responded as follows:

> "I can't rightfully answer that. All I can tell you is I have severe sleep apnea. I have a hard time going to sleep. I have a hard time getting up from sleep. I'm angry all the time because I don't understand what's wrong with me. I've been lied to about a lot of things so I don't know how to answer that"

(Tr. 832). In response to further questioning, Plaintiff reiterated that he was "in pain all the time," adding that he experienced problems being punctual (Tr. 832-833). He acknowledged that none of his treating sources had recommended surgery (Tr. 833-834). He claimed that steroid injections, last administered in 2004, did not relieve his condition (Tr. 834).

### B. The Medical Expert Testimony

Dr. Goodman, reviewing Plaintiff's medical records at the June 26, 2007 hearing, testified that an October, 2005 MRI showed a central and left disk herniation at L5, S1, but that examination notes showed a normal range of hip motion and the absence of atrophy (Tr. 857-858). He also acknowledged that an MRI of the cervical spine showed a small disk herniation at C4-5, but no stenosis (Tr. 858). Dr. Goodman opined, based on these imaging studies, that Plaintiff would not be disabled under Listing 1.01 or 1.04A (Tr. 858-859). Dr. Goodman found further that these conditions would not limit Plaintiff's work abilities, opining that he could perform exertionally medium work[1] (Tr. 859).

---

[1]

20 C.F.R. § 404.1567(a-d) defines *sedentary* work as "lifting no more than 10 pounds

In response to questioning by Plaintiff's attorney, Dr. Goodman acknowledged that none of the treating sources stated that Plaintiff exaggerated his symptoms (Tr. 862). Dr. Goodman, discussing "Dr. [K]almar's opinion that Plaintiff was unable to perform even sedentary work, found that the treating opinion was based on Plaintiff's subjective complaints rather than objective testing (Tr. 863-867).

### C. Medical Evidence

### 1. Treating Sources

In August, 1996, Plaintiff reported periodic cervical and lower back pain after being "hit by a Jeep" during his work shift at the post office (Tr. 136, 201, 206, 221, 228). R. Kania, M.D. prescribed Flexeril (Tr. 138). The same month, x-rays of the thoracic and lumbar spine were normal (Tr. 137). Imaging studies of the knees were unremarkable (Tr. 143). September, 1996 treating notes state that Plaintiff showed "no significant progress" after four weeks of physical therapy (Tr. 198). A March, 1997 MRI showed only only "[v]ery mild degenerative changes" in the thoracic spine, "bulging of the annulus at L5-S1," but no spondylolisthesis (Tr. 106-107). In August, 1997 Roderick J. Clemente, M.D.

---

at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools; *light* work as "lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds;" *medium* work as "lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds;" and that exertionally *heavy* work "involves lifting no more than 100 pounds at a time with frequent lifting or carrying of objects weighing up to 50 pounds. *Very Heavy* work requires "lifting objects weighing more than 100 pounds at a time with frequent lifting or carrying of objects weighing 50 pounds or more. § 404.1567(e).

observed "no motor, sensory or reflex changes," opining that Plaintiff should lose 100 pounds (Tr. 130). January, 1998 treating notes state that Plaintiff experienced "chronic pain syndrome" (Tr. 183). In March, 1998, Plaintiff was issued a TENS unit and a lumbosacral corset for home use (Tr. 175). Treating notes from the following month state that Plaintiff had been noncompliant with an exercise program (Tr. 174). In May, 1998, he was referred to a pain management clinic (Tr. 170). The following month, physical therapy notes indicate that Plaintiff was noncompliant with physical therapy (Tr. 169). In October, 1998, Dr. Clemente observed 5/5 muscle strength, noting that due to back complaints, Plaintiff should "consider retraining for different employment" (Tr. 129). The following month, Plaintiff reported than he was unable to perform strengthening exercises (Tr. 163). A February, 1999 x-ray of the lumbar spine was unremarkable (Tr. 114). The following month, Dr. Clemente opined that complaints of back pain were directly attributable to obesity, noting that Plaintiff was "150 to 160 pounds overweight" (Tr. 128). The same month, Plaintiff requested a psychiatric referral (Tr. 154).

March, 1999 mental health intake notes indicate the absence of substance abuse or aggression issues (Tr. 262). In April, 1999, Edward Kalmar Jr. M.D., noting that he had treated Plaintiff since October, 1996, gave him a "guarded" prognosis (Tr. 257). He opined that pain would interfere with Plaintiff's work activities either "frequently" or "constantly," finding that he would require a sit/stand/walk option (Tr. 259). He found further that Plaintiff was unable to walk for more than two blocks or lift more than 10 pounds (Tr. 259-260). The same month, Plaintiff, reporting to mental health treating sources that he was

"angry," was assigned a GAF of 45 to 55[2] (Tr. 275-278). In June, 1999, Dr. Clemente, noting "no signs of any entrapment, . . . muscular strength loss . . . [or] reflex changes," found that "[f]rom a neurosurgical point of view," Plaintiff was not disabled (Tr. 268). In July, 1999, Miriam Latorre, Psy. D. opined that "[g]iven [Plaintiff's] level of physical pain and psychological distress," he was "in no condition to return to work at present" (Tr. 239). The same month, mental health treating notes state that Plaintiff experienced chronic back pain, but was insightful and experienced the support of his family (Tr. 266, 270). He was assigned a GAF of 65[3] (Tr. 270). In August, 1999, Dr. Kalmar opined that pain, obesity, and depression rendered Plaintiff unemployable (Tr. 250).

Treating notes from April, 2001, remarking on the presence of small cervical and lumbar/sacrolumbar herniations and disc bulges, noted "borderline central spinal stenosis on a congenital basis" (Tr. 390). Plaintiff was prescribed Elavil for depression (Tr. 390-391). In August, 2001, Drs. Swati Sharma and Walter G. Husar opined that Plaintiff was unable to work (Tr. 392, 448-449).

July, 2002 tests showed the presence of sleep apnea (Tr. 361). The following month,

---

[2]

A GAF score of 41-50 indicates "[s]erious symptoms ... [or] serious impairment in social, occupational, or school functioning," such as inability to keep a job. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* at 34 (*DSM-IV-TR*)(4th ed.2000). A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. *Id.*

[3]GAF scores in the range of 61-70 indicate "some mild symptoms [of depression] or some difficulty in social, occupational, or school functioning." American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 32 (*DSM-IV-TR* ), 30 (4th ed.2000).

Plaintiff disputed treating source findings that obesity contributed to his sleep apnea (Tr. 424). He denied recent depression (Tr. 424). In September, 2002, treating notes show that Plaintiff reported ongoing back problems, but no acute distress (Tr. 429, 432, 444). In October, 2002, John W. Norris III, M.D. opined that Plaintiff was disabled, remarking nonetheless that Plaintiff denied depression or anxiety, exhibited a normal gait, and was in no acute distress (Tr. 397, 450). The same month, triage notes indicate that Plaintiff walked into an emergency room demanding immediate treatment for sleep apnea (Tr. 408). Arrangements were made to provide him with a CPAP machine (Tr. 415, 434). Also in October, 2002, Torbjoern G. Nygaard, M.D. found Plaintiff currently unable to work (Tr. 435). Plaintiff received lumbar epidural injections after an EMG showed "[a]pparent right lumbosacral radiculopathy" (Tr. 439-440).

In April, 2003, nerve conduction studies showed "left cervical radiculopathy and evidence of "bilateral moderate carpal tunnel syndrome" (Tr. 353). In May, 2003, an MRI of the cervical spine showed a small disc herniation at C4-5 and a bulging disc at C5-6 creating only "minimal" changes (Tr. 369). The same month, imaging studies showed "[m]inor degenerative change" at C4 and retrolisthesis at C4-5 and C5-6 (Tr. 372).

In July, 2003, Jeffrey Nahmias, M.D. found that Plaintiff's diagnosis as a result of sleep apnea was "fair," noting that Plaintiff experienced daytime sleepiness (Tr. 355). He opined further that sleep apnea would preclude Plaintiff from working with machines, maintaining concentration for extended periods, or being punctual (Tr. 357-358). Dr. Nahmias also found that Plaintiff would require unscheduled work breaks (Tr. 359). The

same month, Dr. Nygaard, noting that Plaintiff had made slow progress since the 1996 accident, opined that he was unable to work (Tr. 373).  In August, 2003, Dr. Norris, noting diagnoses of obesity, sleep apnea, back pain, hypertension, depression, rhinitis, cervical back conditions, and stress, also opined that Plaintiff was unable to work (Tr. 374).  In September, 2005, Dr. Nygaard reiterated his earlier finding that back pain rendered Plaintiff disabled, remarking that sleep apnea created additional limitations (Tr. 623).  An October, 2005 MRI showed a left sided disc herniation at L5/S1 and "diffuse" bulging at L3/4 and L4/5 (Tr. 622).

In June, 2006, Azariah Eshkenazi, M.D. completed a psychological evaluation of Plaintiff, assigning him a GAF of 60-65 (Tr. 624).  Plaintiff expressed anger that the Veterans' Administration limited him to a 20 percent disability (Tr. 632).  Dr. Eshkenazi deemed Plaintiff moderately limited in remembering locations or detailed instruction; carrying out detailed instructions, concentrating for extended periods, observing attendance policies, working/acting independently or with others, making simple decisions, interacting socially, or adapting to workplace changes (Tr. 628-623).  Dr. Eshkenazi found that Plaintiff was *markedly* limited in the ability to complete a workweek without psychological interuptions (Tr. 629).  He found however, that Plaintiff was capable of working in a "low stress" environment and that psychiatric issues did not "exacerbate pain or any other physical symptom" (Tr. 630).  He concluded that Plaintiff was capable of some work if given "proper psychiatric treatment" (Tr. 633).

The following month, Plaintiff sought emergency treatment after experiencing

dizziness of unknown origin (Tr. 635). In November, 2006, Dr. Nygaard once again found that Plaintiff was unable to work (Tr. 740). May, 2007 treating notes indicate that Plaintiff experienced heel spurs (Tr. 770).

## 2. Non-Treating Sources

Evaluative medical records created in February, 1999 state that Plaintiff demonstrated a normal range of motion, muscle strength, and gait (Tr. 126-127). In March, 1999, Dr. Todd Stitik conducted an examination of Plaintiff on behalf of the SSA (Tr. 111-113). Plaintiff reported that back pain prevented him from doing strengthening exercises (Tr. 111). Admitting that he had been fired from his job at the post office, Plaintiff demonstrated 5/5 strength and "no . . . evidence of lumbosacral radiculopathy" (Tr. 113). Dr. Stitik concluded that Plaintiff was capable of returning to custodial work (Tr. 113). An August, 1999 submission shows that Plaintiff received Workers' Compensation between September, 1996 and September, 1997 (Tr. 299).

In February, 2000, Monica Mehta, M.D. examined Plaintiff, finding that he was "dizzy and paranoid" after returning to work following the 1996 workplace accident (Tr. 305). She observed that Plaintiff experienced difficulty heel and toe walking and was unable to squat (Tr. 306). Dr. Mehta opined that Plaintiff's condition would result in the development of a herniated disc and osteoarthritis of the lumbar spine (Tr. 308). She recommended additional mental health treatment (Tr. 308). In May, 2000, Marc Friedman, Ph.D. administered a WAIS-III test, showing a full scale I.Q. of 83 (Tr. 285-286). Plaintiff reported that he continued to experience depression (Tr. 286). Dr. Friedman found that while

Plaintiff's intellectual ;functioning was "low average," with a possible learning disorder, he demonstrated strength in "numerical reasoning, vocabulary and judgment" (Tr. 287). The following month, Salvatore Milazzo, M.D. conducted a consultive physical examination on behalf of the SSA, observing reports of back pain radiating into the lower extremities (Tr. 288). Dr. Milazzo observed a normal gait and the absence of sensory abnormalities (Tr. 289). Dr. Milazzo found "no signs of radiculopathy but pain in the lower back and pain with motion of the right hip" (Tr. 290).

In September, 2006, orthopedist Justin Fernando, M.D. examined Plaintiff on behalf of the SSA, noting "no evidence of any paresthesia" (Tr. 611). Observing that Plaintiff was in no acute distress and could walk and squat without difficulty, he concluded that "[n]o objective limitations were evident by today's examination (Tr. 612-614). Dr. Fernando found the absence of all exertional or non-exertional limitations (Tr. 617-621). The same month, the Veterans' Administration increased Plaintiff's disability to 70 percent as a result of degenerative disc disease and an adjustment disorder (Tr. 725, 731-732).

## D. Vocational Expert Testimony

VE Steven Feinstein classified Plaintiff's past work as a commercial or institutional cleaner as unskilled at the heavy exertional level; security guard work, semiskilled/light; kitchen helper, unskilled/medium; short-order cook, semiskilled/medium; and food preparation, unskilled/light; (Tr. 806-811). ALJ Krappa then posed the following question to the VE:

"I'd like you to assume an individual of the Claimant's age, experience, his

work history and his education and I'd like you to assume that person could perform medium work, however, the work would have to be work that was simple, one or two-step jobs, where the person didn't require any changes in the work setting during the course of the day and they had less than occasional contact with supervisors, coworkers and the general public. Given that residual functional capacity, would this person be able to do any of the prior work the Claimant did?"

(Tr. 812). The VE replied that the question's limitations on public contact and inability to perform heavy lifting would preclude all of Plaintiff's past relevant work (Tr. 812-813). In response to further questioning by the ALJ, he found that if the hypothetical question was modified to allow occasional contact with supervisors, coworkers, and the general public, the individual could perform the unskilled/medium kitchen helper position (Tr. 814). The VE also found that the individual could perform the *medium* work of a janitor/cleaner (2,107,000 jobs in existence nationwide) and dishwasher/kitchen helper (498,000) (Tr. 815-816). He also found that the individual could perform the *light* work of cleaner/housekeeper (893,000) and courier/messenger (106,000), and the *sedentary* work of an addresser (83,000) and sorter (102,000). In response to questioning by Plaintiff's attorney, the VE testified that if the courier/messenger position required a "predictable route," the national job numbers would be reduced from 106,000 to 53,000 (Tr. 818-819). The VE concluded his testimony by stating that if the individual were chronically tardy, suffered from marked concentrational deficiencies, or was required to take unscheduled breaks, all gainful employment would be precluded (Tr. 822-832).

E.    The ALJ's Decision

Citing Plaintiff's medical records, the ALJ found that Plaintiff experienced the severe

impairments of "degenerative disc disease of the cervical and lumbar spine, obesity, and an affective disorder," determining however that none of the impairments met or equaled any impairment listed in 20 CRF Part 404, Subpart P, Appendix 1 (Tr. 491-501, 504).   ALJ Krappa found that while Plaintiff was unable to perform any of his past relevant work, he retained the residual functional capacity ("RFC"):

> "For medium work . . . however, he is limited to jobs[] that involve simple one or two step tasks, jobs where he has an occasional contact with his supervisor, co-workers and the general public, and jobs involving no changes in the work setting during the work day"

(Tr. 504).  Adopting the VE's job findings, *supra*, the ALJ found that Plaintiff could perform the jobs of industrial cleaner and kitchen helper (Tr. 503).

The ALJ found Plaintiff's allegations of limitations "not totally credible," noting that Plaintiff declined to take prescribed psychotropic medication and had not received regular mental health treatment (Tr. 502, 504).   She concluded that Plaintiff's "extensive and unrestricted activities of daily living belie the assertion that he is 'disabled'" (Tr. 500).

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir. 1985).  Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  *Richardson v. Perales,* 402 U.S.

-14-

389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,* 800 F.2d 535, 545 (6th Cir. 1986)(en banc). In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight." *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ. *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. §423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to consider, in sequence, whether the claimant: 1) worked during the alleged period of disability; 2) has a severe impairment; 3) has an impairment that meets or equals the requirements of an impairment listed in the regulations; 4) can return to past relevant work; and 5) if not, whether he or she can perform other work in the national economy. 20 C.F.R. §416.920(a). The Plaintiff has

the burden of proof as steps one through four, but the burden shifts to the Commissioner at step five to demonstrate that, "notwithstanding the claimant's impairment, he retains the residual functional capacity to perform specific jobs existing in the national economy." *Richardson v. Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A. The Treating Physician Analysis

Plaintiff faults the ALJ for rejecting disability opinions by various medical and psychiatric treating sources. *Plaintiff's Brief* at 22-30, *Docket #16.* Citing *Wilson v. Commissioner of Social Sec.,* 378 F.3d 541, 544 (6th Cir. 2004), Plaintiff contends that the ALJ's analysis was both procedurally and substantively inadequate. *Id.*

### 1. Basic Principles

"If uncontradicted, the [treating] physicians' opinions are entitled to complete deference." *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (FN 7)(6th Cir. 1991). "[I]f the opinion of the claimant's treating physician is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record, it must be given controlling weight." *Hensley v. Astrue, 573* F. 3d 263, 266 (6th Cir. 2009)(internal quotation marks omitted)(*citing Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544 (6th Cir. 2004); 20 C.F.R. § 404.1527(d)(2)). Further,

> "[i]f the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship,

supportability of the opinion, consistency of the opinion with the record as a whole, and the specialization of the treating source--in determining what weight to give the opinion."

*Wilson,* at 544.

Regardless of whether substantial evidence is found elsewhere in the record to contradict the source's findings, the ALJ is required nonetheless to give "good reasons" for rejecting the treating physician's opinion:

"'The requirement of reason-giving exists, in part, to let claimants understand the disposition of their cases,' particularly in situations where a claimant knows that his physician has deemed him disabled and therefore 'might be especially bewildered when told by an administrative bureaucracy that she is not, unless some reason for the agency's decision is supplied.'"

*Wilson* at 544 (*citing Snell v. Apfel,* 177 F.3d 128, 134 (2d Cir.1999)).  The mere fact that a treating physician's opinion is contradicted by another source is not a sufficient basis for its rejection.  *Hensley* at 266 ("Nothing in the regulations indicates, or even suggests, that the administrative judge may decline to give the treating physician's medical opinion less than controlling weight simply because another physician has reached a contrary conclusion.").  However, in the presence of contradicting substantial evidence, the ALJ may reject all or a portion of the treating source's findings.  *Warner v. Commissioner of Social Sec.,* 375 F.3d 387, 391 -392 (6th Cir. 2004).

## 2. Application to the Present Case

First, Plaintiff contends that the ALJ did not provide good reasons for rejecting Dr. Lattore's opinion that "physical pain and psychological distress," prevented him from

working. *Plaintiff's Brief* at 23-24 (*citing* Tr. 239, 498). Plaintiff disputes the ALJ's remark that Dr. Lattore was not qualified to pass judgment on his physical claims. He argues further that his disinclination to take prescribed psychotropic medication was improperly cited by the ALJ in rejecting Dr. Lattore's opinion.

I disagree with both of these contentions. First, ALJ reasonably determined that Dr. Latorre, a *mental* health provider, was "not qualified to render assessments regarding the functional effects of physical impairments" (Tr. 498). Plaintiff is arguably correct that Dr. Lattore was qualified to opine on the "interaction" between pain and psychological symptoms. However, the ALJ found that assumptions regarding the source and severity of Plaintiff's pain (clearly outside Dr. Latorre's area of expertise) were based on Plaintiff's subjective accounts rather than objective medical findings.

Second, the ALJ did not err in citing Plaintiff's refusal to take psychotropic medication in rejecting Dr. Latorre's opinion. While Plaintiff's counsel submits that his client's failure to take medication is a manifestation of his mental condition, the record does not show that Plaintiff was otherwise noncompliant in taking prescribed medication. The ALJ's inference that the refusal to take psychological medication undermined the disability claim was reasonable.

Plaintiff also faults the ALJ for rejecting Dr. Nygaard and Dr. Husar's opinions. *Plaintiff's Brief* at 26 (Tr. 373, 435, 448, 623, 740). He contends that these opinions were improperly discounted because of the relative brevity of the treating relationships, arguing that in fact, both physicians were part of long-term treating team. *Id.* However, even

assuming the validity of the "treating team" argument, the "durational" finding is only one of three reasons that the ALJ rejected Dr. Nygaard and Dr. Husar's opinions. The other two reasons are more than adequate to support her determination. First, the ALJ noted that "conclusions of disability are a subject reserved to the Commissioner for ultimate assessment" (Tr. 499). In addition, she observed as follows:

> "not a single physician has explained how an individual possessing full motor strength in all muscle systems, normal gait/station functioning, assesstially full range of motion in all body joints, unimpaired sensory and reflex responses, and using only over-the-counter and non-narcotic analgesic pain medications is incapable of engaging in any work-related activities. Hence, the myriad physician attestations of the claimant's disability cannot be accorded significant credence"

(Tr. 499).

Likewise, the ALJ's partial adoption of Dr. Eshkenazi's opinion does not present grounds for reversal. *Plaintiff's Brief* at 26-27. First, because Dr. Eshkenazi was a one-time examining physician, "the treating physician doctrine simply does not apply." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir. 1994). Dr. Eshkenazi's findings were "entitled to no special degree of deference." *Id.* (*citing Atterberry v. Secretary of Health & Human Servs.*, 871 F.2d 567, 572 (6th Cir.1989)). Further while Plaintiff contends that Dr. Eshkenazi's finding of marked psychological impairments should have been adopted, the ALJ supported her finding of *moderate* psychological impairments as follows:

> "[I]t is significant to note that the claimant has not sought or required multiple inpatient psychiatric hospital admission, frequent hospital emergency room care, regular psychiatric treatment by a mental health professional or the regular use of psychotropic medication for treatment of acute or chronic bouts of depression"

(Tr. 502).

Finally, Plaintiff argues that the ALJ was required to credit the VA disability determination. *Plaintiff's Brief* at 27-28 (*citing Stewart v. Heckler,* 730 F.2d 1065, 1068 (6th Cir. 1984)). However, in contrast to *Stewart*, the VA had determined that Plaintiff was 70, rather than 100 percent disabled. *Id.* at 1068. As such, the ALJ was not required to adopt or even consider the VA's determination. *See Green v. Commissioner of Social Sec*., 2008 WL 3978476, *4 (W.D.Mich.2008)(no case law "reversing an ALJ's decision for failing to give weight to a VA decision of anything less than total disability"). Contrary to Plaintiff's argument that the ALJ failed to consider the full impact of his obesity in combination with his other impairments, the administrative opinion devotes a lengthy discussion of possible limitations created by his weight (Tr. 500-501).

### B. The Hypothetical Question

Citing *Varley v. HHS,* 820 F.2d 777 (6th Cir. 1987), Plaintiff argues next that the hypothetical question to the VE did not account for his true degree of limitation. *Plaintiff's Brief* at 30-31. He contends that the omission of key impairments from the hypothetical question invalidated the VE's finding that Plaintiff could perform a significant range of medium work. *Id.*

*Varley* sets forth the Sixth Circuit's requirements for a hypothetical question. "Substantial evidence may be produced through reliance on the testimony of a vocational expert in response to a hypothetical question, but only if the question accurately portrays

[the] plaintiff's individual physical and mental impairments" (internal citations omitted). *Id*. at 779; *See also Webb v. Commissioner of Social Sec*. 368 F.3d 629, 632 (6th Cir. 2004).

Plaintiff argues specifically that the ALJ erred in not including Drs. Kalmar and Eshkenazi's findings of significant psychological limitation among the hypothetical limitations. As discussed above, because the ALJ provided ample reasons for rejecting Drs. Kalmar and Eshkenazi's claim of extreme physical and psychological impairments, she was not obliged to include these limitation in the hypothetical question. *See Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994)(*citing Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987)("An ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals")). Contrary to the argument that the "medium work" finding was not well-supported, Dr. Goodman testified, based on a review of imaging studies, that Plaintiff was capable of exertionally medium work (Tr. 501, 859).

### C. The Credibility Determination

Plaintiff also submits that the ALJ's credibility determination was based on an erroneous reading of the record. *Id.* 43-46. Citing SSR 96-7p, he contends that the ALJ placed undue emphasis on his daily activities while ignoring medical evidence supporting the disability claim. *Plaintiff's Brief* at 32-34.

The credibility determination, guided by SSR 96-7p, describes a two-step process for evaluating symptoms. *See Duncan v. Secretary of Health and Human Services,* 801 F.2d 847, 853 (6th Cir. 1986). "First, the adjudicator must consider whether there is an underlying

medically determinable physical or mental impairment. . .that can be shown by medically acceptable clinical and laboratory diagnostic techniques." *Id.*  Second, SSR 96-7p directs that whenever a claimant's allegations regarding "the intensity, persistence, or functionally limiting effects of pain or other symptoms are not substantiated by objective medical evidence," the ALJ must analyze his testimony "based on a consideration of the entire case record." [4]

The ALJ supported her credibility determination with record evidence other than Plaintiff's activities.  As discussed above, she found that Plaintiff's claims of limitations were almost completely unsupported by objective medical evidence (Tr. 499, 502).  She pointed out that July and September, 2006 treating notes showed good muscle strength and that more recent records showed a normal gait and range of cervical and lumbar spine motion (Tr. 500). She noted that none of Plaintiff's medical providers recommended surgery (Tr. 500). Because the credibility determination is amply supported by the record, the deference

---

[4] C.F.R. 404.1529(c)(3), 416.929(c)(3) lists the factors to be considered in evaluating  the making the determination:

> "(i) Your daily activities; (ii) The location, duration, frequency, and intensity of your pain or other symptoms; (iii) Precipitating and aggravating factors; (iv) The type, dosage, effectiveness, and side effects of any medication you take or have taken to alleviate your pain or other symptoms; (v) Treatment, other than medication, you receive or have received for relief of your pain or other symptoms; (vi) Any measures you use or have used to relieve your pain or other symptoms (e.g., lying flat on your back, standing for 15 to 20 minutes every hour, sleeping on a board, etc.); and (vii) Other factors concerning your functional limitations and restrictions due to pain or other symptoms."

generally given to an ALJ's credibility determination is appropriate here. *See Casey v. Secretary of Health and Human Services,* 987 F.2d 1230, 1234 (6th Cir. 1993); *See also Anderson v. Bowen* 868 F.2d 921, 927 (7th Cir. 1989)(*citing Imani v. Heckler,* 797 F.2d 508, 512 (7th Cir.1986))(An ALJ's "credibility determination must stand unless 'patently wrong in view of the cold record'").

A reading of the entire transcript shows that Plaintiff was vigorously and competently represented over the long course of this claim. Nonetheless, ALJ Krappa's decision is easily within the "zone of choice" accorded to the fact-finder at the administrative hearing level and should not be disturbed by this Court. *Mullen v. Bowen*, *supra*.

## CONCLUSION

For these reasons, I recommend that Plaintiff's Motion for Summary Judgment be DENIED and that Defendant's Motion for Summary Judgment be GRANTED.

Any objections to this Report and Recommendation must be filed within fourteen (14) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D.

Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within fourteen (14) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. Steven Whalen
R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated: May 5, 2010

CERTIFICATE OF SERVICE

The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on May 5, 2010.

s/Susan Jefferson
Case Manager